1  DOUGLAS W. DAL CIELO (SBN 157109)
   BRIAN M. AFFRUNTI (SBN 227072)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, California 95113
   Telephone:    (408) 287-6262
4  Facsimile:    (408) 918-4501
   Email:    ddalcielo@ropers.com
5  Email:    baffrunti@ropers.com

6  Attorneys for Plaintiffs
   FIBERTREK, INC., LAWRENCE P. WAGNER,
7  and JOHN G. PEERY

**FILED**

JUL 15 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**E-FILING**

8

9              UNITED STATES DISTRICT COURT

10    NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11

12  FIBERTREK, INC., a Nevada corporation;
    LAWRENCE P. WAGNER, an individual;
13  and JOHN G. PEERY, an individual,

14              Plaintiffs,

15        v.

16  PREFERRED CORPORATE SERVICES,
    INC., a Colorado Corporation; DOUGLAS
17  GREGG, an individual; TDG, LLC, a
    Colorado Limited Liability Company;
18  NEIL SMITH, an individual and DOES 1-
    100, inclusive,
19
                Defendants.
20

21

22

23

24

CASE NO.

**C08 03415 RS**

**COMPLAINT**

1. **RICO**
2. **NEGLIGENCE**
3. **NEGLIGENT MISREPRESENTATION**
4. **INTENTIONAL MISREPRESENTATION**
5. **FRAUD**
6. **CONSPIRACY TO COMMIT FRAUD**
7. **CONVERSION**
8. **BREACH OF CONTRACT**
9. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
10. **UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

25        Plaintiffs FIBERTREK, INC., LAWRENCE P. WAGNER, and JOHN G. PEERY

26  (hereinafter collectively "Plaintiffs" or individually "FIBERTREK", "WAGNER", and

27  "PEERY") allege as follows:

28  //

RC1/5146103.1/BMA                    - 1 -

**COMPLAINT FOR DAMAGES**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

## JURISDICTION AND VENUE

1.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under a federal statute, 18 U.S.C. §§ 1961 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO").

2.    This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

3.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this District pursuant to 28 U.S.C. 1391(a)(2) and (b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred within this District.

## INTRADISTRICT ASSIGNMENT

5.    Intradistrict assignment of this matter to the San Jose Division of this Court is appropriate pursuant to Civil Local Rule 3-2(c), (e) as a substantial part of the events or omissions giving rise to the claims herein occurred within the jurisdiction of the San Jose Division.

## THE PARTIES

6.    Plaintiff FIBERTREK is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in the State of California, County of Santa Clara.

7.    Plaintiff WAGNER is an individual and legal resident of the State of California and the Chief Executive Officer of FIBERTREK.

8.    Plaintiff PEERY is an individual and legal resident of the State of California and the Chief Technology Officer of FIBERTREK.

9.    Defendant PREFERRED CORPORATE SERVICES, INC. (hereinafter "PCS") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in the State of Colorado, County of Douglas.

10.    Defendant DOUGLAS GREGG (hereinafter "GREGG") is an individual and legal resident of the State of Colorado.  GREGG is the President of PCS.

11.    Defendant T.D.G., LLC (hereinafter "TDG") is a Colorado Limited Liability Company with its principal place of business in the State of Colorado, County of Larimer. Plaintiffs' are informed and believe, and thereon allege, TDG is an unincorporated association consisting of one member, Defendant NEIL E. SMITH (hereinafter "SMITH"). SMITH is a legal resident of the State of Colorado, County of Jefferson.

12.    Defendant SMITH is an individual and legal resident of the State of Colorado. SMITH is the Global Business Manager of TDG.

13.    Plaintiffs do not know the true names and capacities, whether individual, corporate, associate or otherwise of the other Defendants sued herein as DOES 1 through 100 and, therefore, sues them by those fictitious names. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each fictitiously-named Defendant, and each of them, were contractually, negligently, fraudulently or otherwise in some manner legally responsible for each of the acts, omissions, events or occurrences alleged herein and that Plaintiffs' damages are the direct and proximate result of said acts, omissions, events or occurrences. The names, capacities and relationships of DOES 1 through 100 will be alleged by amendment to this Complaint when they become known.

14.    Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein mentioned existed, a unity of interest and ownership between Defendants such that all individuality and separation ceased and each Defendant became the alter-ego of the other Defendants.

15.    Plaintiffs are informed and believe, and thereon allege, that Defendants are, and at all times herein mentioned were, so inadequately capitalized that, compared to the business to be done by them and where such business was being conducted in relation to the Partnership and the risk of loss attendant thereto, the available capital of the entity was trifling. Legal formalities and obligations were disregarded such that the separate identity of the entity ceased to exist and such entity became the alter ego of the Defendant, and vice versa.

16.    Adherence to the fiction of any separate existence of Defendants as distinct entities apart from the other defendants would permit an abuse of the corporate privilege so as to sanction

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   a fraud or promote injustice.

2       17.    Plaintiffs are informed and believe, and thereon allege that Defendants, and each

3   of them, were, at all times mentioned in this Complaint agents and employees of the other

4   Defendant(s), and in performing the acts alleged in this Complaint, were acting in the course and

5   scope of such agency and employment.

6   **GENERAL ALLEGATIONS**

7       18.    In approximately January 2000, PEERY along with two business partners Bill

8   Henderson and Lee Jolly drafted the Fibercon business plan to fund a fiber-optics project called

9   Elko. Pursuant to the business plan, Lee Jolly was responsible for obtaining funding for the Elko

10  project.

11      19.    After failing to obtain the necessary funding for several years, Lee Jolly quit the

12  business team prior to January 2006. The remaining business partners decided the business plan

13  needed to be revised. WAGNER joined the business team and, along with PEERY, completely

14  revised and rewrote the Fibercon business plan. PEERY is introduced to SMITH of TDG to

15  assist in obtaining the necessary funding for the Elko project.

16      20.    PEERY and SMITH continue to pursue funding sources and SMITH suggested the

17  Company should go "Public" to obtain the amount of funding needed for the Elko project.

18  SMITH introduced PEERY to a business associate, GREGG of PCS. GREGG is introduced by

19  SMITH as a person with experience in the Reverse Take-Over Mergers (hereinafter "RTO").

20  Based on the recommendations of SMITH and GREGG, the decision is made to pursue an RTO

21  with the assistance of SMITH and GREGG and their respective companies.

22      21.    Since Fibercon was not incorporated at this time, SMITH and GREGG

23  recommended merging with a publicly traded shell company. Bill Henderson suggests Resource

24  Materials, Inc. (hereinafter "RMI"), a Nevada Corporation, as a potential shell company. At this

25  point, the business plan is renamed as RMI.

26      22.    In order to raise the necessary funding, SMITH suggests acquiring an existing

27  publicly traded company that needs a viable income producing project to offer its shareholders

28  and investors. SMITH claims the necessary funding for the Elko project can be raised through

RCI/5146103.1/BMA                        - 4 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    this process.

2         23.    On July 1, 2006, SMITH and GREGG recommend RMI acquire a shell company

3    identified as "PCS032." SMITH agreed to notify RMI up-front of the cost of the shell company,

4    the identity of the securities attorney for the company and the identity of the Certified Public

5    Accountant for the company. On July 3, 2006, SMITH requests RMI provide $10,000 to obtain

6    information on the shell company. SMITH informs RMI, "(GREGG) thru PCS and I assisting

7    him, will continue to work with you on this entity to provide public and banking funds for any

8    and all of your ventures." GREGG and SMITH provide RMI with general information about the

9    shell company PCS032. GREGG and SMITH inform RMI that PCS032 is a Nevada Corporation

10   formed in 1999. It is currently in business, located in Irvine, California, working in the

11   telemarketing market and in outsourcing data entry services for US companies to India and China.

12   PCS032 has 175 million common shares and 500,000 preferred shares authorized with

13   10,457,387 of the common shares issued and no preferred shares issued. PCS032 has 43

14   shareholders and four persons/entities control 99% of the company.

15        24.    GREGG and SMITH inform RMI the purchase price for the shell company

16   PCS032 is $300,000, with an option fee of $10,000. RMI is told the company must be purchased

17   in cash and is available immediately through a New York PinkSheets Company Broker. GREGG

18   and SMITH assure RMI that all books, records and filings for PCS032 are complete and current.

19        25.    GREGG and SMITH inform RMI that all requested information on PCS032

20   including the company name, symbol, CUSIP No., financial records, minute records, shareholders

21   list, the identities of the members of the board of directors, the names of selling shareholders, the

22   identity of its CPA, and the identity of its Securities Counsel will be provided upon signing the

23   option and payment of the option fee.

24        26.    GREGG and SMITH outlined the RTO procedure for RMI. RMI will merge into

25   the shell company identified as PCS032. The stock of RMI will be exchanged for shares of the

26   shell company and the shell company changes its name to RMI. The officers of the shell

27   company resign and the shell company directors elect RMI officers as the new directors before

28   resigning.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

27.    On July 6, 2006, WAGNER and PEERY, through their own inquiry, are informed by SMITH that GREGG holds a management position with the proposed shell company.

28.    In order to move forward with the RTO, on July 21, 2006, SMITH suggests RMI execute a written contract with GREGG and PCS and SMITH will continue to assist GREGG and PCS throughout the RTO transaction.  SMITH again confirms the shell company is clean and that upon acquisition, RMI would control 90% of the outstanding stock.

29.    On July 26, 2006, RMI receives and executes a written consulting agreement from PCS (Exhibit A).  Pursuant to the agreement, PCS agrees to arrange for and provide (RMI) with certain due diligence and project analysis services including reviewing the due diligence materials related to the target company PCS032 for the development of a capital formation project to be lead by PCS.  The agreement called for PCS to present its findings and recommendations via a formal written proposal following PCS' due diligence and project analysis review.   On behalf of RMI, WAGNER paid a non-refundable $5,000 retainer fee to PCS for services rendered under the consulting agreement.

30.    By September 6, 2006, PCS fully performed its due diligence and project analysis review pursuant to the July 26, 2006 consulting agreement.  On September 6, 2006, GREGG forwarded a written formal proposal (Exhibit B) for RMI to raise the necessary capital through an RTO with the shell company that had been previously discussed, PCS032.  The proposal references the "public vehicle first discussed" and "the contemplated shell company" in reference to PCS032.  The purchase terms for the shell company identified in the proposal are identical to the purchase terms previously provided to RMI for PCS032.

31.    Pursuant to the terms of the September 6, 2006 PCS proposal, RMI was to pay an option fee of $10,000 to lock up the "contemplated shell company."  If RMI elected not to exercise the option on the "initial shell company," PCS was to deliver two additional (like) shell companies under the same option.  Upon notification to exercise its option to purchase the shell company, PCS was to require the purchase amount of $300,000 to be placed in a PCS trust account with Wells Fargo Bank.  PCS also agreed to provide RMI with all necessary documents and events necessary to effectuate the transaction.

RCI/5146103.1/BMA                                      - 6 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

32.     Pursuant to the terms of the September 6, 2006 PCS proposal, PCS was to retain 5% of the outstanding shares of the shell (PCS032) as its fee for arranging and providing the shell to RMI.  PCS was also to receive, for its initial and continuing developmental and consulting services, a retainer in the amount of $20,000 per month, for 12 months, or until the first $20 million in capital had been raised, whichever occurred first.  PCS was also to receive 10% of the gross amount of all capital arranged for the company and required that RMI pre-pay all travel and travel related expenses and reimburse PCS for all out of pocket expenses.  SMITH provides a time line stating the process might take 60 days, and possibly up to 3 months, to complete the RTO and associated registration.  Also in that communication, SMITH states that past the maximum (3) three month period, GREGG and SMITH would never take another penny except as a commission on the receipt of funds.

33.     SMITH and GREGG emphasized the up-front costs and fees associated with the RTO, including the $300,000 purchase price, are only loans to the new corporation and will all be recovered through the public offering and capital raised therein.  RMI is only committing the option fee of $10,000, as the balance of $290,000 will be kept in the PCS trust account until the transaction is complete and all items are satisfied.

34.     On September 19, 2006, RMI, at the insistence of Bill Henderson, requested information from SMITH and GREGG including references to five former clients who they had represented in similar transactions.  SMITH responds that it is too late for this as "it has been 2 months since we acquired the Shell for you and over 2 weeks since we sent you our proposal" (referencing the September 6, 2006 proposal).  GREGG responds via email to SMITH that providing references is not necessary as he and SMITH are merely facilitators.  As of September 19, 2006, RMI never authorized SMITH or GREGG to purchase a shell company and had not paid the $10,000 option fee.

35.     In an effort to resurrect the proposed transaction, on September 19, 2006, SMITH informs RMI that the transaction would be completed by securities attorneys for all parties and that RMI would probably not be able to find another shell company with "ALL those authorized shares and READY to go to market."  This reference is again to the shell company identified as

1  "PCS032." On the following day, September 20, 2006, SMITH informs RMI if RMI goes

2  through with the transaction, the transaction would be handled by the law firm of Bryan Cave,

3  LLP.

4    36.    On September 20, 2006, GREGG sends correspondence to SMITH indicating he is

5  not surprised to hear that PEERY and WAGNER are backing out. GREGG indicates he had to

6  renew the option three months in a row now and they have to cut their losses at this point to avoid

7  losing the money they had invested.

8    37.    On September 20, 2006, WAGNER wire transfers $10,000 for the Option to

9  purchase the shell company identified as PCS032. The money is transferred to the PCS' Wells

10  Fargo Bank Account provided by GREGG and SMITH.

11    38.    Bill Henderson is dissatisfied with the GREGG's and SMITH's refusal to provide

12  the references requested on September 19, 2006. Bill Henderson decides to back out of the deal

13  and takes his shell company, RMI, with him. Upon notification of Henderson's decision,

14  GREGG and SMITH inform WAGNER and PEERY that this is not a problem and that a new

15  corporation could be formed to provide for the RTO.

16    39.    On September 25, 2006, WAGNER and PEERY decide to move forward with the

17  purchase of the shell company identified as PCS032 and WAGNER wire transfers $150,000 for

18  the first half of the shell purchase to the PCS' trust account at Wells Fargo Bank. SMITH and

19  GREGG refuse to provide the company information for the shell company which they agreed to

20  do at the time the option fee was deposited. SMITH and GREGG fail to provide the books and

21  records of the shell company identified as PCS032 as they agreed to do within 1 day of payment

22  of the option fee. SMITH and GREGG reassure WAGNER and PEERY this information will be

23  provided.

24    40.    On September 27, 2006, WAGNER and PEERY are informed the costs of

25  completing the merger could be as high as $95,000, in addition to the $140,000 owed on the

26  purchase price. WAGNER requests the name of the shell company before agreeing to pay this

27  sum. The next day, September 28, 2006, SMITH responds that WAGNER and PEERY need not

28  worry about the additional money requirement as "WE WILL handle it" in reference to SMITH

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  and GREGG. SMITH does not provide the name of the shell company as requested.

2  41.    Later on September 28, 2006, WAGNER and PEERY learn SMITH and GREGG

3  secured the shell corporation by way of a Note. SMITH notifies WAGNER and PEERY that he

4  cannot provide the name of the company because the shell company is in a "quiet period" while

5  the RTO is completed. SMITH also requests the monthly retainer payments to PCS and TDG be

6  made via wire transfer beginning on October 1, 2006 rather than October 15, 2006 and continue

7  on the first of each month until the transaction is completed.

8  42.    On September 29, 2006, WAGNER makes the initial retainer fee wire transfer of

9  $10,000 to both SMITH and GREGG to the PCS and TDG accounts provided by SMITH and

10  GREGG, respectively.

11  43.    In or about October, 2006, WAGNER and PEERY are informed by PCS that a

12  new company needs to be created, to replace RMI, to merge with PCS032. WAGNER and

13  PEERY form FIBERTREK, a company incorporated under the laws of the State of Nevada in

14  November 2006.

15  44.    On October 23, 2006, SMITH, GREGG, WAGNER and PEERY met in Campbell,

16  California at FIBERTREK's offices and later in San Jose, California. SMITH and GREGG

17  presented a set of documents describing the RTO procedures and provided a timeline for the

18  transaction. The data sheet provided identified the shell company as PCS032. A name of the

19  shell company is not provided. At this meeting, WAGNER and PEERY are informed PCS

20  provided a Note to cover the remaining $140,000 balance used to purchase the controlling interest

21  in the shell company. The $300,000 was to be deposited as proof to the seller that the means

22  existed to complete a purchase transaction. A controlling interest in the shell company was

23  purchased without authorization from WAGNER or PEERY. SMITH and GREGG failed to

24  provide WAGNER and PEERY with the general information and financial records concerning the

25  shell company when the option fee was paid as they agreed. WAGNER and PEERY never had

26  an opportunity to perform a due diligence review of the shell company prior to the purchase as

27  WAGNER and PEERY as they agreed.

28  45.    At a dinner meeting on October 23, 2006 in San Jose, California, WAGNER and

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

RCI/5146103.1/BMA

1    PEERY are informed for the first time that the shell company controlling interest they purchased

2    is All Western Enterprises, Inc. (hereinafter "AWE"). At that time, WAGNER and PEERY

3    believed AWE was the shell company identified throughout as PCS032.

4        46.    On November 11, 2006, SMITH and GREGG inform PEERY and WAGNER that

5    the Note issued by PCS will create a conflict of interest. WAGNER agrees to pay the value of the

6    Note and wire transfers the balance due of $140,000 to the PCS trust account. At this time,

7    PEERY and WAGNER are informed an additional amount of approximately $25,000 will be

8    needed for miscellaneous expenses to complete the RTO.

9        47.    On November 29, 2006, WAGNER and PEERY learn the shell company has been

10   fully paid for. WAGNER and PEERY never authorized the release of the funds paid to the PCS

11   trust account for the purchase of AWE. WAGNER and PEERY were assured they had complete

12   control over the money deposited into PCS trust account. WAGNER and PEERY never had an

13   opportunity to review and reject the acquisition of AWE as stated in the September 6, 2006

14   Consulting Agreement with PCS.

15       48.    WAGNER and PEERY were informed the merger with AWE was completed on

16   February 28, 2007 and FIBERTREK became a publicly traded company, under the symbol

17   FBRK, on March 7, 2007.

18       49.    Pursuant to the terms of the September 6, 2006 PCS proposal, on March 16, 2007,

19   WAGNER and PEERY received a request from SMITH and GREGG to issue them 5% of the

20   outstanding shares of FIBERTREK. A board resolution was signed and 2.5 million shares in

21   FIBERTREK were issued to SMITH and GREGG, or 1.25 million shares each.

22       50.    In May, 2007, after repeated requests to SMITH and GREGG since September

23   2006, WAGNER and PEERY first receive documentation on AWE. SMITH and GREGG had

24   agreed to provide these documents within one day of the payment of the option fee, paid on

25   September 20, 2006, and prior to payment of the balance of $290,000 on the purchase price. The

26   documents received did not include any transaction records for the purchase of AWE or financial

27   records of the company. Upon reviewing the AWE documents provided in May 2007, WAGNER

28   and PEERY first learned the company they purchased and merged with FIBERTREK was not the

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  shell company identified as PCS032. AWE was not fully compliant, registered and ready for

2  public trading as PCS032 was represented to be. PCS032 was also represented to have been in

3  business since 1999 with documented financial records, audits, current filings and sufficient in-

4  house support. AWE was not fit for a merger and was not worth near the $300,000 paid by

5  WAGNER. AWE had no financial records, no filings and other documentation needed for the

6  RTO. The delays in providing the company information for AWE and in finalizing the RTO,

7  resulting in increased costs and expenses to WAGNER and PEERY in excess of $200,000, were

8  the result of SMITH and GREGG attempting to restore AWE to enable the RTO to be completed.

9        51.    WAGNER and PEERY have repeatedly requested all documents relating to the

10  acquisition of AWE and the merger of AWE with FIBERTREK. GREGG and SMITH have

11  never provided transaction records verifying the $300,000 was used to purchase AWE, to whom

12  the $300,000 was paid, and when it was paid. On June 1, 2007, WAGNER and PEERY learned

13  AWE was acquired for significantly less than the $300,000 paid to PCS' trust account.

14

15                          **FIRST CAUSE OF ACTION**
        **(For Violation of the Racketeer Influenced and Corrupt**
16         **Organizations Act ("RICO") Against All Defendants)**

17        52.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 51,

18  inclusive, as though fully set forth herein.

19        53.    Plaintiffs are informed and believes and thereon alleges that the actions and

20  conduct of the defendants as more fully described herein were in violation of 18 U.S.C. §§1962

21  (c) and (d).

22        54.    Defendants formed an association for the purpose of defrauding Plaintiffs.

23  Defendants participated in a careful and deliberate scheme of fraud to prevent Plaintiffs' from

24  ascertaining information about AWE, knowing if said information was fully disclosed, Plaintiffs'

25  would not proceed with the acquisition of AWE and merger with FIBERTREK. Defendants

26  perpetuated the fraud through the use of the United States Postal Service and United States

27  telecommunications lines.

28        55.    SMITH and GREGG made a concerted effort to conceal the identity and financial

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    status of AWE during throughout their business relationship with WAGNER and PEERY until

2    the acquisition and merger were completed enabling the conversion of some or all of the

3    $290,000 deposited into what was represented as PCS' trust account. Throughout their business

4    relationship, SMITH and GREGG represented the shell company as PCS032 with the

5    accompanying information provided on the data sheet for PCS032 at the October 23, 2006

6    meeting in San Jose, California. AWE was not the shell company identified as PCS032 and was

7    valued at substantially less than the company identified as PCS032.

8         56.    The successful completion of this scheme involved the careful and deliberate

9    orchestration by SMITH and GREGG of numerous individuals and entities working with them

10    including persons who SMITH and GREGG represented to be securities attorneys, paralegals and

11    accountants in carrying out this scheme. Each individual and entity working with SMITH and

12    GREGG, at the insistence of SMITH and GREGG, refused to disclose the name of the shell

13    company purchased by Plaintiffs and to provide documentation verifying the acquisition of AWE

14    and the financial terms of said acquisition.

15         57.    Plaintiffs are informed and believe and on that basis allege the association between

16    SMITH and GREGG, along with the individuals and entities working with them, engaged in a

17    "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(1) and (5).

18    Collectively, Defendants and the individuals and entities working with them prevented Plaintiffs'

19    from learning the attributes of AWE until after the acquisition and merger occurred and the

20    $290,000 was withdrawn from what was represented to be a PCS trust account under the

21    exclusive control of WAGNER and PEERY. This pattern of activity of withholding information

22    was carried out for a period of approximately eleven months.

23         58.    Defendants executed this scheme through the use of the United States Postal

24    Service and interstate wire communications in violation of 18 U.S.C. §§ 1341 and 1343.

25    Defendants utilized the United States Postal Service to correspond with Plaintiffs' in furtherance

26    of the fraud alleged herein. Defendants utilized interstate wire communications to receive all

27    payments made from Plaintiffs to Defendants. Specifically, **on three occasions**, Defendants

28    directed Plaintiffs' to utilize the telecommunication wires within the United States to transfer

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    money to a bank account represented as a PCS trust account. These wire transfers of funds

2    occurred on September 20, 2006, September 25, 2006 and November 11, 2006, respectively.

3    Plaintiffs were also directed to utilize the telecommunication wires within the United States to

4    transfer monthly retainers to SMITH and GREGG from October 2006 through April 2007.

5        59.    In addition to engaging in the above described conduct and actions in violation of

6    18 U.S.C §1962(c), Plaintiffs are informed and believe and on that basis allege that the

7    Defendants also violated 18 U.S.C. §1962(d), conspiracy to violate 18 U.S.C §1962(c).

8        60.    Plaintiffs are informed and believe and on that basis allege that there existed

9    among the defendants an agreement to conduct or participate in a scheme to defraud Plaintiffs.

10   This conspiracy extended to the individuals and entities working with SMITH and GREGG.

11   SMITH and GREGG, as well as the individuals and entities working with them formed an

12   association for the purpose of defrauding PEERY and WAGNER by (1) keeping the unauthorized

13   acquisition of AWE confidential; (2) keeping the attributes of AWE confidential until the

14   acquisition and merger were completed; and (3) by refusing to produce transaction records for the

15   acquisition and merger.

16       61.    Plaintiffs have suffered injury as a result of the Defendants' conduct and actions as

17   described above, which were all done in violation of 18 U.S.C §§1962(c) and (d). Plaintiffs were

18   deceived by the Defendants' fraudulent and deceitful activities into expending an approximate

19   amount of $786,000 as well as the transfer of 2.5 million shares of FIBERTREK to Defendants.

20       62.    As a direct and proximate result of the conduct of Defendants, and each of them,

21   Plaintiffs have been damaged in an amount yet to be ascertained, the actual amount to be proven

22   at the time of trial.

23       63.    Pursuant to 18 U.S.C. §1964(a), Plaintiffs' request an order that each Defendant

24   divest themselves of and/or deliver to Plaintiffs all of the proceeds of the monies illegally

25   obtained.

26       64.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs' also seeks treble damages, the cost of

27   suit herein and attorney's fees.

28   //

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

**SECOND CAUSE OF ACTION**
**(For Negligence Against All Defendants)**

2

3      65.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 64,

4    inclusive, as though fully set forth herein.

5      66.    Defendants, and each of them, owed a duty of care to perform the services they

6    agreed to provide through the September 6, 2006 Consulting Proposal and to provide truthful and

7    accurate information to Plaintiffs with respect to its services in connection with the transactions

8    involving Plaintiffs.

9      67.    Defendants breached that duty of care through their actions and/or omissions,

10    including but not limited to, acquiring AWE without authorization from Plaintiffs, by failing to

11    provide general information and financial records of AWE within one day of the payment of the

12    $10,000 option fee, by failing to disclose the attributes of AWE necessary for a due diligence

13    review prior to directing payment for the acquisition of AWE, by releasing funds from the PCS'

14    trust account without authorization from Plaintiffs, and by failing to provide transaction records

15    for the acquisition or merger transactions and failing to provide accounting records for the

16    services allegedly performed by Defendants.

17      68.    As a direct and proximate result of the negligence of these Defendants, Plaintiffs

18    have been damaged in an amount not yet ascertained, the actual amount to be proven at the time

19    of trial.

20

21

**THIRD CAUSE OF ACTION**
**(For Negligent Misrepresentation Against All Defendants)**

22      69.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 68,

23    inclusive, as though fully set forth herein.

24      70.    Pursuant to their agreement with Plaintiffs, Defendants had a duty to provide

25    information concerning the shell company AWE at the time the option fee was paid to enable

26    Plaintiffs to conduct a due diligence review of AWE before the acquisition and merger were

27    completed.

28      71.    Defendants breached that duty of care through their actions and/or omissions,

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

**COMPLAINT FOR DAMAGES**

including but not limited to, acquiring AWE without authorization from Plaintiffs, by failing to provide general information and financial records of AWE within one day of the payment of the $10,000 option fee, by failing to disclose the attributes of AWE necessary for a due diligence review prior to directing payment for the acquisition of AWE, by releasing funds from the PCS' trust account without authorization from Plaintiffs, and by failing to provide transaction records for the acquisition or merger transactions and failing to provide accounting records for the services allegedly performed by Defendants.

72.     From July 2006 through May 2007, Defendants represented Plaintiffs would acquire and merge with a shell company identified as PCS032. Defendants subsequently switched the shell companies and acquired AWE without disclosing this information to Plaintiffs and without authorization from Plaintiffs.

73.     Defendants knew, or should have known, AWE was considerably less valuable than the shell company identified as PCS032. Defendants knew, or should have known, that if the identity and the business and financial history of AWE were disclosed to Plaintiffs, Plaintiffs would have declined to acquire AWE and merge AWE with FIBERTREK.

74.     As a direct and proximate result of the negligent misrepresentations made by Defendants and Plaintiffs justifiable reliance thereon, Plaintiffs have been damaged in an amount not yet ascertained, the actual amount to be proven at the time of trial.

### FOURTH CAUSE OF ACTION
**(For Intentional Misrepresentation Against All Defendants)**

75.     Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 74, inclusive, as though fully set forth herein.

76.     Pursuant to their agreement with Plaintiffs, Defendants had a duty to provide information concerning the shell company AWE at the time the option fee was paid to enable Plaintiffs to conduct a due diligence review of AWE before the acquisition and merger were completed.

77.     Defendants breached that duty of care through their actions and/or omissions, including but not limited to, acquiring AWE without authorization from Plaintiffs, by failing to

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    provide general information and financial records of AWE within one day of the payment of the

2    $10,000 option fee, by failing to disclose the identity of AWE necessary for a due diligence

3    review prior to directing payment for the acquisition of AWE, by releasing funds from the PCS'

4    trust account without authorization from Plaintiffs, and by failing to provide transaction records

5    for the acquisition or merger transactions and failing to provide accounting records for the

6    services allegedly performed by Defendants.

7        78.    From July 2006 through May 2007, Defendants represented Plaintiffs would

8    acquire and merge with a shell company identified as PCS032.  Defendants subsequently

9    switched the shell companies and acquired AWE without disclosing this information to Plaintiffs

10   and without authorization from Plaintiffs.

11       79.    Defendants knew, or should have known, AWE was considerably less valuable

12   than the shell company identified as PCS032.  Defendants knew, or should have known, that if

13   the identity and the business and financial history of AWE were disclosed to Plaintiffs, Plaintiffs

14   would have declined to acquire AWE and merge AWE with FIBERTREK.

15       80.    Plaintiffs justifiably relied on the representations made by these Defendants in

16   their respective documentation prepared by them and in the course of their relationship including,

17   but not limited to, (1) the shell company to be acquired was PCS032; (2) Plaintiffs would receive

18   information on PCS032 when the option fee was paid to enable a due diligence review of PCS032

19   before opting to acquire the shell company identified as PCS032; and (3) all funds transferred to

20   PCS' trust account were under the exclusive control of Plaintiffs.  Plaintiffs relied on these

21   representations in evaluating whether to acquire the shell company they believed was PCS032,

22   transfer the sum of $300,000 for the acquisition of the shell company they believed was PCS032,

23   and merge FIBERTREK with the shell company they believed was PCS032.

24       81.    As a direct and proximate result of the intentional misrepresentations made by

25   Defendants and Plaintiffs justifiable reliance thereon, Plaintiffs have been damaged in an amount

26   not yet ascertained, the actual amount to be proven at the time of trial.

27       82.    The acts and omissions of Defendants described herein were done with a

28   conscious disregard of Plaintiffs' rights and with a specific intent to defraud and injure Plaintiffs,

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   so as to constitute fraud, oppression, and malice under California Civil Code section 3294. By

2   virtue of Defendants' willful and wrongful conduct, Plaintiffs are entitled to punitive and

3   exemplary damages as determined by the court.

### FIFTH CAUSE OF ACTION
**(For Fraud Against All Defendants)**

6   83.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 82,

7   inclusive, as though fully set forth herein.

8   84.    The acts and actions of the Defendants as described above constitute fraud as these

9   acts and actions were done with full knowledge of its falsehood or a complete disregard for the

10  truth.

11  85.    Plaintiffs' are informed and believe and on that basis allege that the acts and

12  actions of Defendants described above were done with the knowledge and intent to defraud

13  Plaintiffs.

14  86.    SMITH and GREGG made a concerted effort to conceal the switch of the shell

15  companies from the shell company identified as PCS032 to AWE, the acquisition of AWE

16  without authorization from Plaintiffs, and the identity and financial records of AWE until the

17  acquisition and merger transactions were completed.

18  87.    At the time Defendants made such representations and concealed such facts from

19  Plaintiffs, the defendants knew such representations were fraudulent, concealed the true facts

20  from Plaintiffs and made such misrepresentations and concealed the true facts with the express

21  intent and ultimate object of inducing Plaintiffs to acquire AWE at a price considerably higher

22  than its fair market value at the time of the acquisition.

23  88.    Plaintiffs reasonably relied on said information and representations made by

24  Defendants in agreeing to transfer the sum of $300,000 for the acquisition of a shell company that

25  had been represented by Defendants to be the shell company identified as PCS032.

26  89.    Plaintiffs were ignorant of the true facts and, as a result of the Defendants

27  fraudulent conduct, expended sums including the $300,000 for the acquisition of a shell company

28  that had been represented by Defendants to be the shell company identified as PCS032, which

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

RCI/5146103.1/BMA                          - 17 -

1    they would not have done had they known the true facts.

2        90.    Plaintiffs could not reasonably have discovered the fraud sooner because of the

3    web of deception and complicated scheme executed by the Defendants and those persons and

4    entities working with them in carrying out the transactions described herein.

5        91.    As a direct and proximate result of the acts and conduct of Defendants, and each of

6    them, Plaintiffs have been damaged in an amount not yet ascertained, the actual amount to the

7    proven at the time of trial.

8        92.    The acts and omissions of Defendants described herein were done with a

9    conscious disregard of Plaintiffs' rights and with a specific intent to defraud and injure Plaintiffs,

10   so as to constitute fraud, oppression, and malice under California Civil Code section 3294.  By

11   virtue of Defendants willful and wrongful conduct, Plaintiffs' are entitled to punitive and

12   exemplary damages as determined by the court.

### SIXTH CAUSE OF ACTION
#### (For Conspiracy to Commit Fraud Against All Defendants)

15       93.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 92,

16   inclusive, as though fully set forth herein.

17       94.    Plaintiffs are informed and believe and on that basis allege that Defendants acted

18   in furtherance of a common design in perpetuation of the scheme to defraud Plaintiffs as

19   described above.  This scheme involved Defendants and individuals and entities working with

20   them including persons who SMITH and GREGG represented to be securities attorneys,

21   paralegals and accountants whom were directed by SMITH and GREGG to carry out and in

22   furtherance of this scheme.

23       95.    Plaintiffs are informed and believe and on that basis allege that Defendants were

24   instrumental in establishing the ring of conspiracy and actively participated in furtherance of the

25   conspiracy's common design.

26       96.    As a direct and proximate result of the acts and conduct of Defendants, and each of

27   them, Plaintiffs have been damaged in an amount not yet ascertained, the actual amount to the

28   proven at the time of trial.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

RC1/5146103.1/BMA                    - 18 -

1    97.    The acts and omissions of Defendants described herein were done with a

2    conscious disregard of Plaintiffs' rights and with a specific intent to defraud and injure Plaintiffs,

3    so as to constitute fraud, oppression, and malice under California Civil Code section 3294.  By

4    virtue of Defendants willful and wrongful conduct, Plaintiffs' are entitled to punitive and

5    exemplary damages as determined by the court.

6    **SEVENTH CAUSE OF ACTION**
**(For Conversion Against All Defendants)**

7

8    98.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 97,

9    inclusive, as though fully set forth herein.

10    99.    Plaintiffs' are informed and believe and on that basis allege that through the

11    Defendants' active participation in the scheme to defraud Plaintiffs, Defendants received

12    $300,000 from Plaintiffs' for the acquisition of a shell company identified as PCS032 which in

13    turn was used, at least in part, to compensate Defendants.  Plaintiffs were informed this sum of

14    money would be maintained in a PCS' trust account under the exclusive control of Plaintiffs.

15    This conversion of funds was accomplished without the knowledge, permission or consent of

16    Plaintiffs' and was carried out deliberately and with the specific intent to deprive Plaintiffs' of its

17    property.

18    100.    The conversion could not have been discovered any sooner because of the

19    complicated fraudulent scheme of the Defendants and their efforts to conceal the scheme.

20    101.    As a direct and proximate result of the conversion of Plaintiffs' monies, Plaintiffs

21    have suffered damages in an amount to be proven at trial.

22    102.    The acts and omissions of Defendants in converting Plaintiffs' monies were done

23    with a conscious disregard of Plaintiffs' rights and with a specific intent to defraud and injure

24    Plaintiffs, so as to constitute fraud, oppression and malice under California Civil Code section

25    3294.  By virtue of Defendants willful conduct, Plaintiffs are entitled to punitive and exemplary

26    damages as determine by the court.

27    //

28    //

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

2

**EIGHTH CAUSE OF ACTION**
**(For Breach of Contract Against All Defendants)**

3    103.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 102,

4    inclusive, as though fully set forth herein.

5    104.    On or about July 26, 2006, RMI and PCS entered into a written Agreement for

6    Services (Exhibit A) pursuant to which PCS agreed to arrange for and provide RMI with certain

7    due diligence and project analysis services including reviewing the due diligence materials related

8    to the target company PCS032 for the development of a capital formation project to be lead by

9    PCS. The agreement called for PCS to present its findings and recommendations via a formal

10    written proposal following PCS' due diligence and project analysis review. RMI paid a non-

11    refundable $5,000 retainer fee to PCS for services rendered under this consulting agreement.

12    105.    The July 26, 2006 Agreement for Services was fully performed and concluded by

13    September 6, 2006 when PCS sent a written Consulting Proposal to RMI (Exhibit B). The

14    Consulting Proposal set forth a recommended plan for RMI to raise the necessary capital to fund

15    the Elko project through an RTO with the shell company that had been previously discussed,

16    PCS032. The proposal references the "public vehicle first discussed" and "the contemplated shell

17    company" in reference to the prior discussions concerning PCS032. The purchase terms for the

18    shell company identified in the proposal are identical to the purchase terms previously provided

19    by Defendants for PCS032.

20    106.    Pursuant to the terms of the September 6, 2006 Consulting Proposal, RMI was to

21    pay an option fee of $10,000 to lock up the "contemplated shell company," again in reference to

22    the shell company identified as PCS032. If RMI elected not to exercise the option on the "initial

23    shell company," PCS was to deliver two additional (like) shell companies under the same option

24    fee. Upon notification to exercise its option to purchase the shell company, PCS was to require

25    the purchase amount of $300,000 to be placed in PCS' escrow account with Wells Fargo Bank.

26    PCS also agreed to provide RMI with the all necessary documents and events necessary to

27    effectuate the transaction. Pursuant to the terms of the September 6, 2006 PCS proposal, PCS

28    was to retain 5% of the authorized shares of the shell company (PCS032) as its fee for arranging

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    and providing the shell to RMI. PCS was also to receive, for its initial and continuing

2    developmental and consulting services, a retainer in the amount of $20,000 per month, for 12

3    months, or until the first $20 million in capital had been raised, whichever occurred first. PCS

4    was also to receive 10% of the gross amount of all capital arranged for the company and required

5    that RMI pre-pay all travel and travel related expenses and reimburse PCS for all out of pocket

6    expenses.

7        107.    Plaintiffs fully performed all conditions, covenants, and promises required by them

8    pursuant to the Consulting Agreement. All consideration due to Defendants was paid. The

9    option fee and the purchase price for a shell company Plaintiffs believed was the shell company

10    identified as PCS032 were transferred to the bank account designated by Defendants. 2.5 million

11    shares of FIBERTREK stock were issued to Defendants. Monthly retainers were paid to

12    Defendants from October 2006 through April 2007.

13        108.    In May, 2007, Plaintiffs' first learned of Defendants' scheme to defraud Plaintiffs.

14    Defendants' acts and omissions constitute a material breach of the September 6, 2006 Consulting

15    Agreement. Without authorization from Plaintiffs, Defendants acquired a different shell company

16    from the shell company identified as PCS032. The company acquired, AWE, was considerably

17    less valuable than the shell company identified as PCS032. The funds placed in what was

18    represented as a PCS' trust account were expended without authorization from Plaintiffs. Despite

19    repeated requests from Plaintiffs, Defendants failed to disclose the information on the shell

20    company as required by the express terms of the agreement. Plaintiffs never had an opportunity

21    to analyze the proposed shell company after payment of the option fee before committing the

22    balance of $290,000 as stated in the agreement. Despite repeated requests from Plaintiffs,

23    Defendants have failed to provide transaction reports for the acquisition of AWE and its merger

24    with FIBERTREK.

25        109.    As a direct and proximate result of Defendants' breach of the September 6, 2006

26    Consulting Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.

27    //

28    //

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

## NINTH CAUSE OF ACTION
### (For Breach of the Implied Covenant of Fair Dealing)

110.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 109, inclusive, as though fully set forth herein.

111.    Inherent and implied by law and fact in the September 6, 2006 Consulting Agreement between PCS and RMI is the covenant of good faith and fair dealing imposing a duty of good faith and fair dealing on each party in its performance of the contract.

112.    The September 6, 2006 Consulting Proposal set forth a recommended plan for RMI to raise the necessary capital to fund the Elko project through an RTO with the shell company that had been previously discussed, PCS032. The proposal references the "public vehicle first discussed" and "the contemplated shell company" in reference to the prior discussions concerning PCS032. The purchase terms for the shell company identified in the proposal are identical to the purchase terms previously provided by Defendants for PCS032.

113.    Pursuant to the terms of the September 6, 2006 Consulting Proposal, RMI was to pay an option fee of $10,000 to lock up the "contemplated shell company," again in reference to the shell company identified as PCS032. If RMI elected not to exercise the option on the "initial shell company," PCS was to deliver two additional (like) shell companies under the same option fee. Upon notification to exercise its option to purchase the shell company, PCS was to require the purchase amount of $300,000 to be placed in PCS' escrow account with Wells Fargo Bank. PCS also agreed to provide RMI with the all necessary documents and events necessary to effectuate the transaction. Pursuant to the terms of the September 6, 2006 PCS proposal, PCS was to retain 5% of the authorized shares of the shell company (PCS032) as its fee for arranging and providing the shell to RMI. PCS was also to receive, for its initial and continuing developmental and consulting services, a retainer in the amount of $20,000 per month, for 12 months, or until the first $20 million in capital had been raised, whichever occurred first. PCS was also to receive 10% of the gross amount of all capital arranged for the company and required that RMI pre-pay all travel and travel related expenses and reimburse PCS for all out of pocket expenses.

114.    Plaintiffs fully performed all conditions, covenants, and promises required by them pursuant to the Consulting Agreement. All consideration due to Defendants was paid. The option fee and the purchase price for a shell company Plaintiffs believed was the shell company identified as PCS032 were transferred to the bank account designated by Defendants. 2.5 million shares of FIBERTREK stock were issued to Defendants. Monthly retainers were paid to Defendants from October 2006 through April 2007.

115.    In May, 2007, Plaintiffs' first learned of Defendants' scheme to defraud Plaintiffs. Without authorization from Plaintiffs, Defendants acquired a different shell company from the shell company identified as PCS032. The company acquired, AWE, was considerably less valuable than the shell company identified as PCS032. The funds placed in what was represented as a PCS' trust account were expended without authorization from Plaintiffs. Despite repeated requests from Plaintiffs, Defendants failed to disclose the information on the shell company as required by the express terms of the agreement. Plaintiffs never had an opportunity to analyze the proposed shell company after payment of the option fee before committing the balance of $290,000 as stated in the agreement. Despite repeated requests from Plaintiffs, Defendants have failed to provide transaction reports for the acquisition of AWE and its merger with FIBERTREK.

116.    The actions and omissions of Defendants described herein constitute a breach of the implied covenant of good faith and fair dealing in performance of the contract.

117.    As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing implied in all contracts, Plaintiffs have suffered damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### (For Unjust Enrichment Against All Defendants)

118.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 117, inclusive, as though fully set forth herein.

119.    Plaintiffs are informed and believe and on that basis allege that as a direct and proximate result of the acts and conduct alleged herein, each of the Defendants have been

RCI/5146103.1/BMA

- 23 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    unjustly enriched, and has obtained money, commissions, earnings and benefits including the

2    issuance of shares of FIBERTREK from Plaintiffs to which Defendants are not otherwise entitled,

3    and which they would not have obtained had the true facts been known to Plaintiffs.

4         120.    At Defendants direction, Plaintiffs' transferred the sum of $300,000 to a PCS trust

5    account for the purchase of a shell company identified as PCS032.  Without Plaintiffs'

6    knowledge, Defendants had previously acquired a different shell company, AWE.  The acquired

7    shell company AWE was considerably less valuable than the shell company identified as

8    PCS032.  Plaintiffs are informed and believe and on that basis allege the remaining balance of the

9    $300,000 was distributed amongst Defendants for their own personal gain.  Based on

10   representations by Defendants of their continued efforts to finalize the terms of the acquisition of

11   the shell company identified as PCS032 and the merger with FIBERTREK, Plaintiffs made other

12   payments to Defendants including monthly retainers, travel expense reimbursements, the issuance

13   of FIBERTREK and other related expenses for work never performed by Defendants.  Plaintiffs

14   would not have made paid these additional benefits to Defendants had the true facts been known

15   to Plaintiffs.

16        121.    Defendants have been unjustly enriched in an amount, not yet ascertained, which

17   represents the total compensation and expense reimbursement unlawfully obtained from

18   Plaintiffs, which rightfully belongs to Plaintiffs and should be returned.

19                                        **PRAYER**

20   WHEREFORE, Plaintiffs demand judgment as follows:

21   **As to the First Cause of Action:**

22   1.    Special Damages in an amount to be determined at trial;

23   2.    An order that each defendant divest themselves of and/or deliver to Plaintiffs all of

24   the proceeds of monies and other forms of consideration unlawfully obtained from Plaintiffs;

25   3.    Treble damages pursuant to 18 U.S.C. §1964(c); and

26   4.    Attorney's fees and costs pursuant to 18 U.S.C. §1964(c).

27   **As to the Second, Third, Eight, Ninth and Tenth Causes of Action:**

28   1.    Damages in an amount to be determined at trial;

RCI/5146103.1/BMA                              - 24 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1        2.      Restitution of moneys wrongfully obtained from Plaintiffs, in an amount to be

2  determined at trial; and

3        3.      An accounting of all amounts that defendants have wrongfully obtained from

4  Plaintiffs.

5       **As to the Fourth, Fifth, Sixth and Seventh Causes of Action:**

6        1.      Damages in an amount to be determined at trial;

7        2.      Restitution of moneys wrongfully obtained from Plaintiffs, in an amount to be

8  determined at trial;

9        3.      An accounting of all amounts that defendants have wrongfully obtained from

10  Plaintiffs; and

11        4.      Punitive damages in the amount to be determined at trial.

12  Dated:  July 11, 2008           ROPERS, MAJESKI, KOHN & BENTLEY

13

14                      By: _____

15                          DOUGLAS W. DAL CIELO
                               BRIAN M. AFFRUNTI

16                             Attorneys for Plaintiffs
                             FIBERTREK, INC., LAWRENCE P.
                             WAGNER and JOHN G. PERRY

17

18                **DEMAND FOR JURY TRIAL**

19       Plaintiffs FIBERTREK, INC., LAWRENCE P. WAGNER and JOHN G. PERRY hereby

20  demand trial by jury.

21  Dated:  July 11, 2008           ROPERS, MAJESKI, KOHN & BENTLEY

22

23                      By: _____
                               DOUGLAS W. DAL CIELO

24                               BRIAN M. AFFRUNTI
                             Attorneys for Plaintiffs

25                             FIBERTREK, INC., LAWRENCE P.
                             WAGNER and JOHN G. PERRY

26

27

28

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Jose*

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

FIBERTREK, INC., a Nevada Corp., Lawrence P. Wagner, an individual, and John G. Peery, an individual

## DEFENDANTS

PREFERRED CORPORATE SERVICES, INC., a Colorado Corp., Douglas Gregg, an individual, et al.

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

DOUGLAS W. DAL CIELO (157109) / BRIAN M. AFFRUNTI (227072)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA  95113

Attorneys (If Known)

**C08  03415**

**RS**

*ADR*

*E-FILING*

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [X] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [X] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury — Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities — Employment
- [ ] 446 Amer. w/Disabilities — Other
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt.Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus – Alien Detainee
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Judge from Magistrate Judgment

Transferred from

Appeal to District

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE

DATE   July 11, 2008

SIGNATURE OF ATTORNEY OF RECORD